## No. 16,678.

KINGSLEY ET AL. *v.* CITY AND COUNTY OF DENVER ET AL.
(247 P. [2d] 805)

Decided August 12, 1952.

Mr. Teller Ammons, Mr. Charles D. Bromley, Mr. Robert T. Kingsley, Mr. John P. Holloway, for plaintiffs in error.

Mr. Leonard Campbell, Mr. Burton Crager, for defendants in error City and County of Denver and William H. McNichols.

Messrs. Dickerson, Morrissey & Zarlengo, Messrs. Lee, Bryans, Kelly & Stansfield, for intervener.

*En Banc.*

Mr. Justice Stone delivered the opinion of the court.

Herein we shall refer to plaintiff Automatic Voting Machine Corporation as Automatic, to Shoup Voting Machine Corporation as Shoup, and to the City and County of Denver as Denver.

Plaintiff Kingsley brought action as a taxpaying elector of Denver, in behalf of herself and other taxpaying electors, against Denver and its auditor, praying that an ordinance, and contract pursuant thereto, for the purchase of voting machines from Shoup be adjudged illegal, and that execution of such contract be enjoined. Automatic joined therein as party plaintiff. Shoup intervened as a defendant and filed separate answer.

In the year 1950, Automatic contracted with Denver for the sale to it of 500 voting machines and leased to it 60 additional machines, with provision for application of rentals paid on the purchase price in case of subsequent purchase thereof. Thereafter, in March 1951, Denver advertised for bids for the further purchase or rental of 100 or 160 voting machines and, in response, both Automatic and Shoup submitted bids, each for its separate type of machine. The Denver Election Commission recommended acceptance of the bid of Automatic, but the city council by appropriate ordinance directed the purchase of 100 voting machines from Shoup and authorized the Mayor to execute a contract for such purpose. Although recording his disagreement with the decision of the majority of the council in accepting the Shoup bid, the Mayor signed the ordinance and the proposed contract submitted by Shoup for said purchase, dated April 27, 1951, which provided that payment for the machines should be by a deferred-payment plan; the first install-

ment of $7,050.00 to be payable on or before May 7, 1951, and the remaining nine installments of $15,000.00 each to be payable on or before the 7th day of May of each succeeding year, with interest on deferred payments at the rate of two percent per annum, commencing May 7, 1951, payable semiannually; said deferred payments to be evidenced by interest bearing bonds, certificates of indebtedness, or other obligations of Denver. Following hearing on motions for temporary injunction and to dismiss, at which testimony and other evidence was tendered in behalf of parties plaintiff and defendant, the trial court dissolved its restraining order, found in favor of defendants and gave judgment of dismissal.

Intervener challenges plaintiffs' right to maintain the action. Plaintiff Kingsley could maintain the action as a taxpaying elector, *Ferch v. District Court,* 123 Colo. 262, 227 P. (2d) 997, and we need not be concerned as to her coplaintiff.

Counsel for plaintiffs in error here urge that the contract for purchase of voting machines is void for the reason that it provides for the issuance of bonds or equivalent securities, without a vote of the taxpaying electors in contravention of section 206 of the Denver charter, adopted in 1914, which provides: "No loan shall be created nor bonds issued unless the question of creating the same and issuing the bonds therefor shall be submitted to the vote of such of the qualified electors of the city and county of Denver as shall, in the year next preceding such election, have paid a property tax therein and a majority of those voting upon the question by ballot shall ·vote in favor of creating such debt and issuing such bonds, * * *."

█ Authority to issue bonds in payment for voting machines is provided for in section 8, article VII of the Constitution. This section was adopted in 1906. The amendment thereof in 1946 made no substantial change from the prior provisions insofar as we are here concerned. The readoption of an amendment in the same

language formerly employed, without change or limitation, carries with it the meaning which the legislature had theretofore put upon it. *School District v. Hastings,* 122 Colo. 1, 220 P. (2d) 361; *Hammond v. McDonald,* 49 Cal. App. (2d) 671, 122 P. (2d) 332; *Mumme v. Marrs,* 120 Tex. 383, 40 S.W. (2d) 31. Subsequent to the adoption of said constitutional amendment, and in 1912, the people adopted amendment to section 6, article XX, of the Constitution, providing that the people of the city are vested with and shall always have the power to make or replace its charter, "which shall be its organic law and extend to all its local and municipal matters."

■ That amendment further specifically provides that the city and the citizens thereof shall have all other powers requisite for the administration of its municipal matters, including the power to control the issuance, refunding and liquidation of all kinds of municipal obligations, including bonds. While the right to use voting machines in general elections is a matter of state control, the purchase of such machines by the municipality as here proposed is a local or municipal matter, and the bonds issued under authority of the constitutional amendment of 1906 must also comply with the requirements of the charter adopted in 1914 under authority of the constitutional amendment of 1912. Therefore we must hold that section 206 of the charter applies to the proposed bond issue for the purchase of voting machines, and must sustain plaintiffs' challenge to the validity of bonds issued without vote of the qualified taxpaying electors thereon.

It is further urged that the purported contract is void because it provides for the barter of the authorized bonds to the contractor instead of providing for their public sale. The Constitution authorizes the governing body to provide for the payment for voting machines "by the issuance of interest bearing bonds" which "shall not be issued or sold at less than par." No charter provision, enacted under subsequent constitutional author-

ity, forbids. In the case before us, the bid of Shoup stated a definite price payable either in cash or bonds. The bonds, if taken, were to be taken at par in payment of the cash price named in the bid. We see no prohibition from the issuance of the bonds directly to Shoup in payment instead of requiring the sale thereof for cash to be used in such payment, at the discretion of the city council. See, Ann. 91 A.L.R., pp. 34, et seq.

■ Also, it is insisted that the procedure adopted by the council was invalid in that it delegated to the Mayor the power to specify the type of securities to be issued in payment for the voting machines. We think this contention involves a distinction of form rather than of substance. The amounts, terms and interest rate of payments were determined by the council. There was no discretion as to security. Only the name of the obligations was to be supplied. "What is true about bonds is true about certificates or indebtedness. Indeed it is difficult to see any distinction between the two as they are commonly known to the business world. The essence of each is that they contain a promise under the seal of the corporation, to pay a certain sum to order or to bearer." *Denver v. Home Savings Bank*, 236 U. S. 101, 35 Sup. Ct. 265, 59 L. Ed. 485. There was no substantial discretion or power here delegated to the Mayor, such as to avoid the contract.

■ Again, complaint is made that the bid of Shoup was higher than the bid of Automatic, with the result that the contract was not let to the lowest bidder. It is apparent that due to the different methods of construction, the nature of the machines was such that it was impossible to draw specifications to permit competitive bidding and the council, under the circumstances here, had the right and duty to use its discretion as to the more desirable machine, independent of bid. Such being the case, there is no merit to the contention that bidding was necessary. Since we conclude that no bidding was necessary, there is no merit to plaintiffs' further con-

tention that there was illegality attendant upon the provisions of the contract extending the time of delivery beyond the date specified in the bid. *Hodgeman v. City of San Diego,* 53 Calif. App. (2d) 610, 128 P. (2d) 412; *Los Angeles Dredging Co. v. City of Long Beach,* 210 Calif. 348, 291 Pac. 839, 71 A.L.R. 161.

Again, it is urged that the contract authorized by ordinance was invalid in that it was let without approval of the commissioner of supplies, in opposition to the advice of the Mayor and contrary to the recommendation of the election commission. Voting machines are not supplies; consequently, the approval of the commissioner of supplies is not necessary. *Eggart v. Westmark,* 45 So. (2d) 505; *Automatic Voting Machine Co. v. Board of Chosen Freeholders of Bergen Co. et al.,* 120 N.J.L. 264, 199 Atl. 375. While the advice of the Mayor might well be worthy of attention, it could not counteract the effect of his signature to the ordinance authorizing the purchase of the machines. As to the protest of the election commission, the constitutional authority for purchasing these machines provides that when the *governing body* of Denver shall adopt and purchase voting machines, *such governing body* may provide for the payment therefor. As heretofore stated, the purchase of such machines by the municipality is a local or municipal matter, therefore controlled in Denver by charter and ordinances, rather than by statute; consequently, the provision of chapter 185, section 3, page 443, S.L. Colo. 1947, purporting to give certain authority to the election commission in connection with the purchase of voting machines, is without effect as to Denver, even if it were not in apparent conflict with the constitutional authority of the governing body of Denver to purchase such machines.

Finally, plaintiffs urge that the contract authorized by ordinance for the purchase of voting machines is void because there was no prior appropriation for the payment on the purchase price of $7,050.00 which was required to be made in the then current year of 1951. In

answer to this contention, counsel for Denver and intervener insist that the express constitutional authority for the council to purchase voting machines and issue bonds in payment therefor, as to such purchases, overrode and nullified the provisions of section 204 of the charter requiring a prior appropriation to validate a municipal contract. They further point to the holding of the trial court that the acceptance of the bid by the city council amounted to a contract without further execution of any document and constituted an appropriation of all funds necessary to carry it out, and that if that proposition were not accepted, there was an appropriation already in effect sufficient to discharge the obligations of the contract for the first year, citing *City of Denver v. Hubbard*, 17 Colo. App. 346, 68 Pac. 993.

First, as to the necessity for compliance with the charter provision for budgeting and appropriation. The Denver charter provides in substance that on or before the first Monday of November in each year the heads of various departments, offices and commissions shall furnish the Mayor an estimate in writing of the probable expense to be incurred in their several departments for the next ensuing fiscal year, which shall specify in detail such probable expenditures, and that the Auditor shall certify to the Mayor the amount necessary to be raised by taxation to pay interest on bonded indebtedness and to provide for the sinking fund; that thereafter and on or before the first Monday in December the Mayor shall present to the council a detailed statement of the amount necessary to defray the expenses of the city and county government for the ensuing fiscal year, and that the council shall thereupon make a budget of the estimated amounts required to pay such expenses, based on the Mayor's budget; that after the final estimate is made it shall be signed by the Mayor and Clerk and filed in the office of the Auditor, and "that the several sums shall then be appropriated by ordinance for the ensuing fiscal year to the several purposes and de-

partments therein named." Section 204 of the charter provides: "Neither the Council nor any officer shall have authority to make any contract or do anything binding on, nor impose upon the city and county any liability to pay money, until a definite amount of money shall have been appropriated for the liquidation of all pecuniary liability of the city and county under such contract, or in consequence thereof. Such contract shall be ab-initio, null and void as to the city and county for any other or further liability * * *." Thereby appropriation is indispensable to obligation. *Smith Canal Co. v. Denver,* 20 Colo. 84, 26 Pac. 844.

Similar provisions are common in city charters and statutes and we have therein a well recognized purpose of financial control over officers and protection of taxpayers. *State ex rel. Cole v. Kellar,* 129 Fla. 276, 176 So. 176; *Commonwealth ex rel. v. Foster,* 215 Pa. 177, 64 Atl. 367; *Samuel v. Borough of South Plainfield,* 136 N.J.L. 187; 54 Atl. (2d) 717. In the case of *Burt v. Municipal Council of the City of Taunton,* 275 Mass. 535, 176 N.E. 511, taxpayers sought injunction against a proposed contract by the city to purchase a pumping engine on the ground that there was no appropriation therefor. The court said, "All the moneys in the hands of the city treasurer appear to have been already appropriated to specific uses * * *. As has been held repeatedly, the design of the budget law for cities was to set rigid barriers against expenditures in excess of appropriations, to cultivate municipal thrift, to prevent the borrowing of money for current expenses and in general to put cities upon a sound financial basis so far as those ends can be achieved by legislation. [Citing cases.] It would strongly tend to frustrate this design if the juggling with appropriations already made, such as is thus disclosed, were upheld." In the constitutional provision regarding purchase of voting machines, such purchase is not made mandatory, but optional, and we find nothing indicating intended authority for such purchase in

the absence of financial ability to make payment or without proper budgeting and appropriation therefor. No reason for such extraordinary power is suggested. The constitutional authority for such purpose and the charter provisions for budgeting and appropriation appear in no respect in conflict. Had it been intended to permit such purchase free from these salutary and long recognized restrictions it would hardly have been left to inference. We are not persuaded by the logic of *Darling v. City of Manistee,* 166 Mich. 35, 131 N.W. 450, and prefer rather to follow that of *Automatic Registering Machine Co. v. Pima County,* 36 Ariz. 367, 285 Pac. 1034; *People ex rel. v. City of Geneva,* 90 N. Y. S. 275, and *Empire Voting Machine Co. v. City of Chicago,* 267 Fed. 162. As said in the Empire case, authority to determine the form of an indebtedness is one thing, but authority to create the debt without prior appropriation is quite another matter.

■ Second, as to the finding of the court that in fact there was a sufficient appropriation. From the provisions of the charter hereinbefore summarized, it is apparent that an appropriation within the meaning of the word in the charter requires the budgeting of anticipated expenses "to the several purposes" and the inclusion of a specified amount for each purpose so specified in the budget, in the annual appropriation ordinance, in which the total amount of appropriations must not exceed ninety percent of the anticipated revenue, as limited by the charter. To hold that the city council could by ordinance contract for the expenditure of money at any time during the year and thereby legally appropriate the contracted amount, would nullify altogether the effect and the purpose of the annual budget and appropriation provisions.

■ Third, as to the finding that there was an appropriation already in effect sufficient to discharge the obligation of the contract for the first year. The estimate

of the election commission of expense for the year 1951 included items for capital outlay as follows:

"10% Payment on Voting Machines 65050
Interest on Deferred Payments 14635
New calculator to replace old
 Burroughs 350
Totals 80035"

Also included in the Election Commission estimate, under the heading of "Work Program City and County of Denver 1951 Expenditure Plan," were sixteen items of expense involved in the conduct of the office of the Election Commission, including cost of regular and extra office force; conduct of Municipal Election; registration expenses, printing and publications; office supplies, and other specific items, together totaling $132,843.00. Based on those estimates, the appropriation ordinance included in the General Fund Improvement appropriations, the appropriation to the Election Commission as spending authority: "Permanent improvements, election commission, 80,035"; and included in the General Fund Appropriations for Independent Agencies, the appropriation to the Election Commission, "Election Commission, 132,-800." It is urged by counsel for the city that, as held by the trial court, these items constitute appropriations out of which the ordered expenditures of $7,050.00 in the fiscal year 1951 could properly be paid. To this we cannot agree. Both counsel and the trial court relied on *City of Denver v. Hubbard,* 17 Colo. App. 346, 68 Pac. 993. Therein was involved, not the purchase of specific property, but of a continuing service of furnishing street lights for a term of ten years, and the substance of the court's holding was that, since the contract was not for the purchase of specific property where the debt became absolute even though payments might be distributed over a term of years, but rather was for the purchase of a service for which no payment was obligated except when and as the service was performed and no absolute debt existed except as the service was performed; there-

fore an existing appropriation for lighting streets and municipal buildings sufficient to meet the anticipated payment to become due in the current year was sufficient to support the validity of the contract. As particularly in point here, the appropriation there, upon which reliance was placed, was apparently made in contemplation of such a contract for street lighting as was challenged in that action, rather than for payment of a prior obligation or for meeting other operating expenses of the department, as in the situation before us. The charter provides that the sums appropriated shall be "to the several purposes" therein named, and that the council shall have no authority to make any contract until a definite sum of money shall have been appropriated for the liquidation of all pecuniary liability of the city "under such contract, or in consequence thereof." Had the city council in anticipation of the purchase of voting machines included in the budget of the election commission an item for payment during the ensuing year under such a contract, and had the appropriation included the item so budgeted, then plainly a contract during the ensuing year requiring payment not in excess of the amount so budgeted and appropriated would have been valid, but that was not the case in the budget and appropriation here relied on. In the year 1950 a contract had been made for the purchase of voting machines from Automatic to be paid for by deferred payments. It is undisputed that the budget item of "10% Payment on Voting Machines 65050" and "Interest on Deferred Payments 14635" were the exact amounts due during that year on the automatic machines so purchased. The entire amount of those appropriations was for the specific purpose of meeting the pre-existing contract with Automatic and could be used only for the payment of that obligation. "In determining whether a liability incurred is in excess of the departmental appropriation, the amounts needed for the satisfaction of all pre-existing contracts, including the salaries for the whole fiscal year

of persons already in office at the time of the incurring of the liability in question, must be deducted from the appropriation." (Citing cases.) *McHenry v. City of Lawrence*, 295 Mass. 119, 3 N.E. (2d) 262.

 It is undisputed that the budget items totaling $132,843.00 and the subsequent appropriation of $132,800.00 was intended to provide payment for the items of contemplated expense specifically itemized in the commission's budget, none of which pertained in any respect to purchase of voting machines. Under charter provisions, after the budget is made, the several sums shall then be appropriated by ordinance *"to the several purposes and departments therein named."* True, the charter provides that, "The budget shall be prepared in such details as to the aggregate sum and the items thereof allowed to each department, office or commission as the council shall deem advisable subject to limitations in this charter," and where, as in the case before us, a single appropriation is made covering the total of numerous items separately provided for in the budget, but included within the same general class, we do not hold that the expenditure for each of said items is restricted to the amount budgeted to it separately, but rather that the total expenditure for the amounts so budgeted together must not exceed the total of the appropriation therefor, and that the money appropriated to that class can be used for no other purpose except the items in the budget for which the appropriation was made. In the case before us, either the appropriations must be held void as being without a specified purpose, or they must be construed as being for the purposes specified in the budget upon which the appropriations are, and must be, based. The payment of $7,050.00 as authorized by the city under the ordinance and contract for purchase of the Shoup machines could not by any contortion be fitted into any of the purposes specified in those budgeted items, nor do we think that any validity results by virtue of the provision included in the appropriation

ordinance declaring, "The foregoing appropriations may be expended for both ordinary recurring expenditures and permanent improvements connected with the respective agencies." The charter requires that the appropriation be made to the purposes therein named, and its safeguards may not be so readily evaded. "Thus the *general rule* is that appropriations of municipal funds, whether general or specific, for a given object or a definite purpose cannot be diverted to any other purpose * * *. Furthermore, the fact that the municipal assembly, acting with abundant caution, appropriated a larger sum than was necessary to pay a particular indebtedness, constitutes no warrant for spending the surplus of that appropriation in the discharge of other obligations." McQuillin Municipal Corporations, vol. 15, pages 198, 199; see, *Chatfield Co. v. City of Waterbury*, 88 Conn. 322, 91 Atl. 436.

Under the provisions of the Denver charter, appropriation items must be tied to the budget; payments of city funds must be restricted to the purposes for which they were appropriated and budgeted, and any contract for payment during the year 1951 not so appropriated and budgeted for that year and not caused by any casualty, accident or unforeseen contingency after the passage of the annual appropriation ordinance, as provided in section 204 of the charter, must be held void.

The judgment is reversed.

Mr. Justice Alter and Mr. Justice Knauss concur in the result.